# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION


KHALIL ELBANNA,

        Plaintiff,

vs.                                    Case No. 3:07-cv-926-J-32MCR

CAPTAIN D'S, LLC, a
Delaware limited liability
company,

        Defendant.

---

## <u>ORDER</u>[1]

In this case, plaintiff alleges he was rejected as a restaurant franchisee because he is Arab. He brings claims seeking damages from the defendant restaurant franchisor for alleged violation of 42 U.S.C. § 1981, and for defamation. Before the Court is defendant Captain D's, LLC's Motion For Summary Judgment (Doc. 36) and plaintiff Khalil Elbanna's Objections To Magistrate Judge's Order Denying Plaintiff's Motion For Leave To File An Amended Complaint. (Doc. 40.) The parties have filed responses (Docs. 50-2, 53) and evidentiary materials (Docs. 36, 39,

---

[1] Under the E-Government Act of 2002, this is a written opinion and therefore is available electronically. However, it is intended to decide the matters addressed herein and is not intended for official publication or to serve as precedent.

1

48, 59, 62-2), and the Court heard argument of counsel at a hearing on January 5, 2009  (Doc. 62), the record of which is incorporated.

## I.  **Facts**

Defendant Captain D's, LLC ("Captain D's") owns and operates approximately 600 quick-serve seafood restaurants throughout the United States.  (Doc. 36 at 4.)  Plaintiff Khalil Elbanna ("Elbanna") was born in Beirut, Lebanon, where he was raised and educated.  He moved to the United States in 1984, and became an American citizen in the late 1980's.  He is a businessman and holds several Shoney's restaurant franchises.  (Docs. 48-2 at 1 (Elbanna Decl. ¶ 2); 39-2 at 10, 11, 16, 19, 22-26.)

In January 2005, Elbanna first contacted Captain D's about acquiring a franchise.  Elbanna submitted a franchise application on January 30, 2005.  (Doc. 36-2 at 10 (Elbanna Dep. at 39-40)).  On March 21, 2005, the Captain D's Finance Approval Committee approved Elbanna as a potential franchisee.  (Doc. 39-3 at 24.)  Captain D's vice president of franchise development J. Michael Pearce advised Elbanna that he "had met Captain D's financial requirements and had received initial approval to become a Captain D's franchisee."  (Doc. 48-2 at 2 (Elbanna Decl. ¶ 6).)  On April 11, 2005, Elbanna met Captain D's vice president of franchise operations Bill Nelson and then-company president Ron Walker.  (Doc. 36-2 at 13, 18; Doc. 48-2 at 2 (Elbanna Decl. ¶ 7).)

In May, 2005, Elbanna proposed a new Captain D's restaurant for Kingsland,

Georgia on a site that had an existing vacant Ponderosa restaurant building. (Doc. 36-2 at 14 (Elbanna Dep. at 53); Doc. 48-2 at 2 (Elbanna Decl. ¶¶ 8-9) .) He did so with full knowledge that the franchise development agreement with Captain D's gave it full authority to accept or reject any proposed franchise site. (See Doc. 39-3 at 29.) After review by the site approval committee, in August 2005, Captain D's denied the conversion design prepared by Elbanna's architect as being inconsistent with its desired design. (Doc. 36-2 at 19 (Elbanna Dep. at 76).)

On August 15, 2005, Pearce visited a second site Elbanna proposed for a Captain D's franchise, a vacant piece of property in Baldwin, Florida at the intersection of U.S. Highway 301 and Interstate 10. On September 23, 2005, Captain D's sent forms to Elbanna which said again that Elbanna should not "legally bind yourself by contract to purchase or lease property UNTIL YOU HAVE RECEIVED AN ACCEPTANCE OF YOUR SITE IN WRITING FROM CAPTAIN D'S . . . ." (Doc. 39-3 at 41.) On October 28, 2005, Elbanna purchased the Baldwin property, again without the necessary formal written approval from Captain D's. (Doc. 36-2 at 20 (Elbanna Dep. at 77).) Captain D's rejected that site, citing its poor demographics.

Two years later, Elbanna sought to acquire two existing Captain D's franchises, located in Okeechobee and Sebring, Florida, and entered into a purchase and sale agreement with the owner of the sites, Tim Blackman, for $1,750,000. (Doc. 48-2 at

3 (Elbanna Decl. ¶ 15).)[2]

On July 25, 2007, Becky Brown, Captain D's franchise business manager, e-mailed Nelson, vice president of franchise operations, saying that Elbanna had been approved as a franchisee in March 2005 "under different criteria than is required today." Brown stated that the company would have to collect a new application, run a new backgound check, and receive verifiable financial information from Elbanna in support of the proposed 2007 franchise transfer. Nelson replied on that same date that he had spoken twice to Elbanna telling him he would have to go through the entire approval process. He noted that Elbanna had operated Shoney's restaurants. (Doc. 36-8 at 32.) Nelson asked company area brand manager from Orlando, Kathy Parker, to visit and eat lunch at one of Elbanna's Shoney's restaurants, located in Jacksonville, which she visited on July 27, 2007.

On July 30, 2007, Nelson wrote to Elbanna advising that the company's previous approval of Elbanna as a franchisee was no longer valid and that he would be required to submit a new application for approval. (Doc. 48-2 at 3 (Elbanna Decl. ¶ 16).) Nelson wrote "[a]s a new franchisee, you (and any partners) must have $750,000 net worth, with $300,000 of your net worth liquid per restaurant," and that

---

[2] To fund the purchase, Elbanna said he obtained a bank loan commitment for sixty percent of the purchase price (or $1,050,000), and sold two of his existing Shoney's restaurants franchises in April and June 2007 netting $1 million. (Doc. 48-2 at 3-4 (Elbanna Decl. ¶ 15)

Elbanna would have to have an operating partner with "quick-serve restaurant experience." Among the forms enclosed was a new franchise application form. (Doc. 39-2 at 3.) The company would only consider "liquidity and total net worth. . . cash or something that could be readily converted to cash. But not a debt instrument. . . . We wanted liquidity that could be accessed but at the same time did not add leverage." (Doc. 36-9 at 5 (Payne Dep. at 19-20).)

On July 31, 2005, Parker reported about her visit to Elbanna's Shoney's restaurants in an e-mail to Nelson. She said that she and her colleagues

> went to Shoney's on Busch/Dunn Avenue to eat lunch. We thought at first they were closed. The parking lot was horrible there was trash all over it; the building was in need of a good cleaning. We went inside and waited to be seated; no one came or acknowledged us. After that we left. I think there might have been 2 guests inside. It was very disappointing.

(Doc. 36-10 at 23.) After receiving Parker's e-mail, Nelson testified he planned "on doing an inspection myself, an unannounced visit to the three locations that I was aware of at the time that Mr. Elbanna operated." (Doc. 36-8 at 2 (Nelson Dep. at 170-71).)

On August 2, 2007, Nelson e-mailed company president and chief executive officer David Head and others within the company about the "Blackman-Elbanna Deal" meaning the proposed sale of the Sebring and Okeechobee franchises to Elbanna. (Doc. 62-2.) Nelson wrote:

> The deal would be with Khalil Elbanna, an individual that was approved several years ago to develop in Jacksonville Florida, but never signed an agreement. He wanted to get permission to convert a Ponderosa into a Captain D's, which we refused. He will have to go through the process again to get approved.
>
> . . .
>
> On the other question: Is Khalil Elbanna qualified to purchase and run the restaurants? I have not heard great things so far. I will be making a trip next week to verify his operations of his Shoney's. At this point, if he qualifies financially, I am not sure if we will approve him as a franchisee. But I believe it is important to review and follow the same process on all deals similar to this.

(Id.) Head responded: "Your call. Sneak attack his Operation . . . ." (Id.)

On August 6, 2007, Nelson wrote to Tim Blackman that the company would not exercise its right of first refusal in connection with the proposed transfer of the Okeechobee and Sebring Captain D's restaurants to Elbanna on the condition that 1) the purchase price for the restaurants not fall below $1,750,000 as reflected in the purchase agreement signed by Elbanna, and 2) Elbanna met Captain D's current financial and operational requirements. (Doc. 39-2 at 4.)

Elbanna submitted his franchise application on or about August 7, 2007. (Doc. 48-2 at 4 (Elbanna Decl. 17).) His personal financial statement attached to the application listed his "Current assets" as $200,000 "Cash on hand and in bank." Other assets were: listed securities $256,000; unlisted securities $6,755,500; real estate owned $1,580,000; and tangible personal assets $43,000. (Doc. 39-2 at 22.)

6

Elbanna said he submitted the application prior to his receipt of the July 30, 2007 letter outlining the financial requirements. For this reason, Elbanna said that his application did not include his available line of credit. (Doc. 36-2 at 23, 24 (Elbanna Dep. at 90, 95-96).) According to Elbanna, in mid August, 2007, "I have money in stock. I have cash money sitting in the banks. I have a line of credit for $1 million and Mr. Nelson knew about it." (Doc. 36-2 at 23 (Elbanna Dep. at 91).) Elbanna testified that in August 2007, he had $450,000 liquid unencumbered funds available plus a line of credit. (Doc. 36-2 at 23 (Elbanna Dep. at 91).)

According to Elbanna,

> Shortly after submission of my application and financial statement, I called Mr. Nelson and advised him that in addition to the $456,000.00 in cash and publicly traded securities reflected on my personal financial statement, that I also had available to me approximately $750,000.00 on a preexisting line of credit secured by my real property assets. The cash available under the line of credit with Ameris Bank was in excess of $750,000.00 in August of 2007, in part, as a result of realizing the proceeds from the sale of my Shoney's restaurants . . . only a few months earlier. Instead of placing the cash proceeds from the sale of these restaurants into a bank account, I chose to pay down my existing line of credit, as I knew it would still be available to me.

(Doc. 48-2 at 4 (Elbanna Decl. 18).) According to Elbanna, "[t]he cash readily available to me in August 2007 was in excess of $1,200,000," which he communicated to Captain D's. (Id. ¶ 19; see also Doc. 36-2 at 28, 35-36 (Elbanna Dep. at 110, 140-41).)

On August 9, 2007, Nelson traveled from Nashville to Jacksonville to evaluate Elbanna's existing Shoney's restaurant operations located in Brunswick, Georgia, St. Augustine, Florida, and Dunn Avenue, Jacksonville. The visits were unannounced "to know exactly what the guest is seeing, what the guest is talking about, . . . what they're touching, they're feeling." (Doc. 36-7 at 9 (Nelson Dep. at 35).) Nelson ate an early dinner at Elbanna's Brunswick restaurant and a late dinner at the St. Augustine Shoney's on August 9, 2007. The next morning, he ate breakfast at the Jacksonville Dunn Avenue Shoney's. Nelson did not take pictures of the three locations during his visits. Notes from Nelson's three visits to Elbanna's Shoney's restaurants report negative conditions at all three locations. (Doc. 36-8 at 34.) Captain D's cites to internal Shoney's 2006 inspection reports of the three locations as corroboration. (Docs. 36 at 10-11; 36-15 at 2-7.) Nelson said his intent was to give Elbanna "a fair shot" and that he was in favor of the deal going through. "I wanted to do the deal for Blackman . . . . Blackman had been a long-term franchisee with the company and . . . he wanted out. I don't want a franchisee in the system that . . . that is negative and doesn't want to be there. I was motivated to do it." (Doc. 36-8 at 7 (Nelson Dep. at 191).) Nelson acknowledged that between 2000 and 2007, he had conducted unannounced visitation of restaurants owned by prospective franchisees only twice: Elbanna's and an African American transferee applicant. Both applicants were denied a franchise. (Doc. 36-7 at 21, 24 (Nelson Dep. at 81-84, 95-

8

96); Doc. 52-6.)

Nelson testified that in 2006, with the arrival of David Head as the company's new president and chief operating officer, "I picked up from David, that we needed to raise the bar" to ensure that "prospective applicants for transfer were of good standing operationally." "David Head came in 2006 and really wanted us to raise the bar. And so since then, we have really scoped out any kind of transfers since 2006, and made sure that they were the operators that we wanted in our system." Nelson said that determinations were made on a "case-by-case basis" and that according to internal verbal guidelines, the company reviews existing operations of the prospective transferee. That's something I decided, . . . to make sure that we were maintaining the right people . . . the right operational people coming into our system." (Doc. 36-7 at 18, 19 (Nelson Dep. at 72, 75-76).) The company's liquidity requirements were also increased from 2005 to 2007. (Doc. 36-8 at 2 (Nelson Dep. at 170).)

Company chief financial officer V. Michael Payne reviewed Elbanna's financial information. (Doc. 36-9 at 5 (Payne Dep. at 19).) Payne conceded that the company had no process in place to verify the value of real estate holdings. (Doc.36-9 at 10 (Payne Dep. at 38).) Further, Payne acknowledged that had Elbanna taken out a loan from his line of credit, and put that cash money in his bank account prior to his application, that he would have satisfied Captain D's liquidity requirements in his application. (Id. at 39, 54.) Though it was Captain D's standard protocol to converse

9

with the applicant and obtain follow-up or supplemental information if an application was incomplete, Elbanna was never contacted by the company asking him to submit additional financial information that was missing from his application, to verify financial information, or to discuss his management intentions for the two franchises he intended to purchase. (Doc. 48-2 at 5 (Elbanna Decl. ¶ 20); Doc. 36-7 at 41 (Nelson Dep. at 164).)

The financial and visitation issues were presented to the Captain D's Franchise Committee which made the decision to deny Elbanna the franchise transfer. (Doc. 36-8 at 12 (Nelson Dep. at 211).) On August 24, 2007, Nelson wrote to Elbanna reiterating the company's financial requirements that he must have $600,000 in liquidity ($300,000 for each restaurant) and $1,500,000 total net worth ($750,000 for each restaurant) to qualify for the two Captain D's franchise restaurants and noting that Elbanna did not meet those requirements.

> You listed your liquidity at $200,000. We also could not verify the value of the other assets listed on your financial statement and, therefore, cannot determine your net worth qualifications.
>
> Given the above information and the estimated costs associated with the required remodel of the restaurants to the current Seafood Kitchen image, we have determined that we cannot approve your application. In addition, we have determined that, based on the observed quality of the operations of you existing restaurants, we also would not approve your application for that reason as well.

(Doc. 39-2 at 27.) The letter was copied to Tim Blackman "because the business

transaction involved Blackman, the Captain D's franchisee who sought to sell his restaurants to Elbanna." (Doc. 36 at 12.) Elbanna faxed the August 24, 2007 rejection letter to Joe Phraner, former CEO of Shoney's restaurants. (Doc. 36-2 at 40.)

Nelson telephoned Elbanna on August 24 with this same information, advising Elbanna "that Captain D's had decided to reject my application . . . based on the fact that I did not meet the company's financial liquidity requirements." Elbanna told Nelson that he had in excess of $750,000 available on an existing line of credit, and Nelson responded: "'Don't you get it? We don't want you as a franchisee.'" (Doc. 48-2 at 6 (Elbanna Decl. ¶ 23).)

Nelson also telephoned Blackman on August 24 to advise about the rejection. In response to Blackman's question as to why, Blackman states:

> Mr. Nelson gave me a very vague and general explanation that he had visited Mr. Elbanna's Shoney's restaurant and that he did not like the look of a few items on the food bar at the restaurant. He further stated that he walked back into the kitchen of Mr. Elbanna's restaurant and did not like what he saw. He did not give me any specific examples of conditions he observed.

(Doc. 48-3 at 2 (Blackman Decl. ¶ 6).)[3] According to Elbanna, the three restaurant managers all deny that Nelson ever had access to the restaurants' kitchens, which

---

[3] There is no competent evidence that Nelson ever called the Shoney's kitchen "filthy," as Elbanna alleges in his complaint. (See Compl. ¶ 59).)

Elbanna says is confirmed by surveillance video tape recordings. (Doc. 48-2 at 4 (Elbanna Decl. ¶ 24).)

On September 4, 2007, Tim Blackman and his brother met with the Captain D's officials in Nashville concerning the rejected deal and Nelson told them the same thing he had previously. Nelson's account of the meeting is consistent: "I told him that the operations of the restaurants in Jacksonville were suspect, and that we would not approve it based on that and his [Elbanna's] financial information." (Doc. 36-8 at 30 (Nelson Dep. at 283.) Elbanna was not present at the meeting. (Id.) In an October 4, 2007 internal e-mail about the Blackmans' attempt to sell their restaurants, Captain D's franchise business manager Becky Brown characterized Elbanna as "not approvable." Nelson responded that "Khalil is bad news." (Doc. 48-14.)

Captain D's asserts that there was never any discussion at any time about Elbanna "being an Arab, as he describes himself." (Doc. 36-4 at 13 (Payne Dep. at 51); Doc. 36-12 (Nelson Decl. ¶ 17).) Approximately 50 percent of Captain D's stores are owned and operated by 83 franchisees. (Doc. 36 at 4.) Captain D's has six Pakistani franchisees and one franchisee from Egypt. Another franchisee is of Syrian ancestry. Seventeen of Captain D's 83 franchisees "are self-identified minorities." (Docs. 36-12 (Nelson Decl. ¶¶ 10-11) .)

Elbanna brought this two-count complaint, alleging that Captain D's is liable for violating the provisions of 42 U.S.C. § 1981 and for common law defamation. As to

his Section 1981 claim, Elbanna alleges that he "is Arabic and of middle eastern descent and has physical characteristics common to persons of middle-eastern descent." (Doc. 1 at 8 (Compl. ¶ 38).) The complaint alleges that "Mr. Elbanna believes and hereby alleges that Captain D's continuous refusal to approve Mr. Elbanna's potential restaurant site locations and refusal to approve and contract with Mr. Elbanna as a franchisee was solely due to Mr. Elbanna's race." (Id. ¶ 40.) He alleges that the "purported grounds" for Captain D's rejection of his contract to purchase two franchises in 2007 "are merely a pretext for Captain D's discrimination of Mr. Elbanna based on his race." (Id. ¶ 45; see also id. ¶ 51.) In his papers filed in response to defendant's motion, Elbanna states that he "does not seek damages for rejection of the two proposed sites in 2005," but that "Captain D's initial approval of Mr. Elbanna in 2005, without the involvement of Bill Nelson, as well as Captain D's handling of the site approval process, are both relevant to Mr. Elbanna's discrimination claim in the rejection of his application in 2007." (Doc. 50-2 at 15-16.)

Count II for defamation alleges that Captain D's August 24, 2007 letter rejecting him as a franchisee, which was "published" to Tim Blackman, was "false, misleading, and defamatory" by containing statements that "falsely communicate that Mr. Elbanna did not operate high quality restaurants and that he did not have the financial resources to operate a Captain D's franchise." (Compl. ¶¶ 57, 58) Plaintiff further alleges that at the September meeting with Mr. Blackman, "Nelson told Blackman in

13

the presence of others that he personally inspected the kitchen in one of Mr. Elbanna's Shoney's restaurants and described the kitchen as 'filthy,'" which Elbanna alleges is "untrue" and "defamatory *per se.*" (Id. ¶¶ 59-61.)

## II.   Standard of Review

Summary judgment is proper where "there is no genuine issue as to any material fact" and "the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). "The burden of demonstrating the satisfaction of this standard lies with the movant, who must present pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, that establish the absence of any genuine, material, factual dispute." Branche v. Airtran Airways, Inc., 342 F.3d 1248, 1252-53 (11th Cir. 2003) (internal quotations omitted).  An issue is genuine when the evidence is such that a reasonable jury could return a verdict for the nonmovant.   Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).   In determining whether summary judgment is appropriate, a court must draw inferences from the evidence in the light most favorable to the nonmovant and resolve all reasonable doubts in that party's favor.  Centurion Air Cargo, Inc. v. United Parcel Serv. Co., 420 F.3d 1146, 1149 (11th Cir. 2005).

## III.   Discussion

### A.   42 U.S.C. § 1981

Section 1981 prohibits racial discrimination in the making and enforcement of

14

private contracts. 42 U.S.C. § 1981. "The aim of the statute is to remove the impediment of discrimination from a minority citizen's ability to participate fully and equally in the marketplace." Brown v. American Honda Motor Co., 939 F.2d 946, 949 (11th Cir. 1991). This right extends to private business dealings as well as to interactions between citizens and government. Id.

To recover under Section 1981, a plaintiff must demonstrate that he is a member of a protected class and that he suffered intentional discrimination because of this status which affected him in the making and performance of a contract. See Jackson v. BellSouth Telecommuns., 372 F.3d 1250, 1270 (11th Cir. 2004). Section 1981 requires proof of intentional discrimination. Brown, 939 F.2d at 949.

A plaintiff can establish a prima facie case of discrimination using direct evidence of discrimination or by relying on circumstantial evidence to prove discriminatory intent. Wilson v. B/E Aerospace, Inc., 376 F.3d 1079, 1086 (11th Cir. 2004).[4] Conceding that this is a circumstantial evidence case, (Doc. 50-2 at 13), Elbanna acknowledges that he must establish a prima facie case of discrimination according to the framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).

---

[4]     Claims brought under Section 1981 are analyzed under the same framework and have the same requirements of proof as those brought under Title VII of the 1964 Civil Rights Act. Shields v. Fort James Corp., 305 F.3d 1280, 1281 (11th Cir. 2002).

Thus, to establish a prima facie case circumstantially, Elbanna must show that: (1) he belongs to a protected class; (2) he was qualified, meeting Captain D's legitimate expectations with regard to operating a transferred franchise; (3) he suffered an adverse action; and (4) Captain D's treated similarly situated persons outside his classification more favorably. See McDonnell Douglas Corp., 411 U.S. at 802; Holifield v. Reno, 115 F.3d 1555, 1562 (11th Cir. 1997); Howard v. BP Oil Co., 32 F.3d 520, 524 (11th Cir. 1994); see also Elkhatib v. Dunkin Donuts, Inc., 493 F.3d 827, 830 (7th Cir. 2007). "Demonstrating a prima facie case is not onerous; it requires only that the plaintiff establish facts adequate to permit an inference of discrimination." Holifield, 115 F.3d at 1562.

If Elbanna establishes a prima facie case creating a presumption of intentional racial discrimination in connection with the 2007 franchise denial, the burden then shifts to Captain D's to rebut the presumption by articulating a legitimate, non-discriminatory reason which is clear, reasonably specific and worthy of credence. Hall v. Alabama Ass'n of Sch. Bds., 326 F.3d 1157, 1166 (11th Cir. 2003); Howard, 32 F.3d at 524. At this stage, the Captain D's has a burden of production, not of persuasion; "[t]he defendant's burden, like Plaintiff's *prima facie* burden, is easily fulfilled," Howard, 32 F.3d at 524, and defendant does not have to persuade a court that it was actually motivated by the reason advanced. Hall, 326 F.3d at 1166 (citing McDonnell Douglas, 411 U.S. at 802). The Eleventh Circuit has described this burden

on the defendant as "exceedingly light." Batey v. Stone, 24 F.3d 1330, 1334 (11th Cir. 1994) (citations omitted).

If Captain D's satisfies its burden, the presumption against the defendant is rebutted, and Elbanna must show that the defendant's proffered reason is merely pretext for an illegal motive. McDonnell Douglas, 411 U.S. at 802-04; Rojas v. Florida, 285 F.3d 1339, 1342 (11th Cir. 2002). At this phase, Elbanna must "'introduce significantly probative evidence showing the asserted reason is merely pretext for discrimination.'" Sheppard v. Sears, Roebuck & Co., 391 F. Supp. 2d 1168, 1180 (S.D. Fla. 2005) (quoting Zaben v. Air Prods. & Chems., Inc., 129 F.3d 1453, 1457 (11th Cir. 1997)). The Court's inquiry in this third step in the analysis "proceeds to a new level of specificity . . . ." Brooks v. County Comm'n of Jefferson County, Ala., 446 F.3d 1160, 1162 (11th Cir. 2006)(internal quotations omitted). "The plaintiff may succeed in this either directly by persuading the court that a discriminatory reason more likely motivated the [defendant] or indirectly by showing that the [defendant's] proffered explanation is unworthy of credence." Brooks, 446 F.3d at 1163 (internal quotations and citation omitted).

Plaintiff may defeat a motion for summary judgment by undermining the credibility of a defendant's explanations for its actions without directly showing that defendant harbored an illegal motive. Arrington v. Cobb County, 139 F.3d 865, 875 (11th Cir. 1998); Barr v. City of Eagle Lake, No. 8:06-cv-1568-T-27TGW, 2008 WL

17

717821, at *7 (M.D. Fla. March 17, 2008).

> [P]roof that a defendant's articulated reasons are false is not *proof* of intentional discrimination; it is merely *evidence* of intentional discrimination. However, *evidence* of intentional discrimination is all a plaintiff needs to defeat a motion for summary judgment. That evidence must be sufficient to create a genuine factual issue with respect to the truthfulness of the defendant's proffered explanation.

Howard, 32 F.3d at 525 (emphasis in original). Plaintiff may do this "by pointing to 'weaknesses, implausibilities, inconsistences, incoherencies, or contradictions' in the proffered explanation.'" Brooks, 446 F.3d at 1163 (citing Jackson v. Alabama State Tenure Comm'n, 405 F.3d 1276, 1289 (11th Cir. 2005)).

"A reason is not pretext for discrimination 'unless it is shown *both* that the real reason was false, *and* that discrimination was the real reason.'" Brooks, 446 F.3d at 1163 (quoting St. Mary's Honor Center v. Hicks, 509 U.S. 502, 515 (1993)). Moreover, "[i]if the employer proffers more than one legitimate, nondiscriminatory reason, the plaintiff must rebut each of the reasons to survive a motion for summary judgment." Crawford v. City of Fairburn, Ga., 482 F.3d 1305, 1308 (11th Cir.), cert. denied, 129 S.Ct. 495 (2007). Elbanna cannot establish pretext merely by questioning the wisdom of the Captain D's reasons, at least not where the reason is one that might motivate a reasonable franchiser. Alexander v. Fulton County, Ga., 207 F.3d 1303, 1339 (11th Cir. 2000) (citing Combs v. Plantation Patterns, 106 F.3d 1519, 1543 (11th Cir. 1997)); Damon v. Fleming Supermarkets Of Florida, Inc., 196

F.3d 1354, 1361 (11th Cir. 1999) (courts "are not in the business of adjudging whether employment decisions are prudent or fair. Instead, our sole concern is whether unlawful discriminatory animus motivates a challenged . . . decision."). Elbanna must meet Captain D's proffered reasons - financial capability and restaurant operations ability - head on and rebut them. Austin v. Progressive RSC, Inc., 265 Fed. Appx. 836, 846 (11th Cir. 2008); Wilson, 376 F.3d at 1088, demonstrating that *each* of the defendant's stated reasons is pretextual. Thus, Elbanna must "'do more than establish a prima facie case and deny the credibility of defendant's witnesses.'" Howard, 32 F.3d at 525-26 (citation omitted). "'Although the intermediate burdens of production shift back and forth, the ultimate burden of persuading the trier of fact that the employer intentionally discriminated against the employee remains at all times with the plaintiff.'" Brooks, 446 F.3d at 1162. It is the Court's responsibility "for drawing the lines on what evidence is sufficient to create an issue on pretext." Rojas, 285 F.3d at 1344.

The Court will assume, without deciding, that Elbanna has established a prima facie case and continue. See Crawford, 482 F.3d at 1308.[5] In rebuttal, Captain D's

---

[5] Elbanna contends that he was discriminated against because he "is Arabic and of middle eastern descent and has physical characteristics common to persons of middle-eastern descent." Material facts exist that Elbanna has met the "ancestry or ethnic characteristics" requirement of a section 1981 claim. See St. Francis College v. Al-Khazraji, 481 U.S. 604, 613 (1987); Zaklama v. Mt. Sinai Medical Center, 842 F.2d 291, 295 n.2 (11th Cir. 1988)(resident doctor who was a native of Egypt alleged discrimination on the basis of race and thus stated a claim

proffers two legitimate nondiscriminatory reasons for not approving Elbanna in 2007 for the franchise transfers: (1) failure to meet financial liquidity requirements and (2) unsatisfactory operations, defeating the presumption of discrimination. The Court examines whether Elbanna has produced evidence sufficient for a reasonable jury to find that these proffered reasons are pretext of intentional discrimination based upon Elbanna's race.

### 1. **Financial Liquidity Requirements**

Captain D's argues that "[b]y only listing $456,000 in assets that were readily convertible to cash [cash plus listed securities], Elbanna lacked the requisite $600,000 in liquidity to purchase two Captain D's franchise restaurants." (Doc. 36 at 9.) The evidence is undisputed that prior to its August denial, Elbanna informed Nelson that he had access to a $1 million line of credit, and that he could have withdrawn from that $750,000 in cash "no questions asked." Company chief financial officer Payne acknowledged that had Elbanna withdrawn money from his line and credit and placed it in a bank account, he would have met Captain D's liquidity requirements. But, the company's financial requirements were not met on the face of the application.

There is no dispute that Captain D's is entitled to require a designated level of

_____

under section 1981). Under the <u>McDonnell Douglas</u> framework, in addition to being a member of a protected class, Elbanna has established an inference that Captain D's treated similarly situated non-Arab persons more favorably, and that he was qualified for the proposed franchise transfer.

liquidity and satisfactory restaurant operations of existing franchises to qualify for obtaining one of its franchises; defendant is entitled to establish its own preferred qualifications and to define those qualifications in any way it likes.  See Brown, 939 F.2d at 951 ("[a] contract may be granted 'for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as it . . . is not for a discriminatory reason'" (citation omitted)).   Further, Captain D's lesser qualification standards in 2005 do not prevent it from increasing those standards in 2007 and enforcing them as they applied to Elbanna, so long as it applied those new standards to others in 2007 and subsequent thereto.  The issue is whether Captain D's applied its legitimate franchise expectations in a discriminatory manner.

Elbanna has adduced no evidence that Captain D's chose to enforce its stricter qualification requirements against only certain racial minorities.  Compare Elkhatib, 493 F.3d at 831 (plaintiff established prima facie case and pretext because franchisor did not apply its proffered reason for refusing a franchise relocation equally to other non-protected franchisors).  While Captain D's officials testified that had Elbanna withdrawn the letter of credit money and deposited it in the bank prior to applying for the transfer franchises he would have met the liquidity requirements, this evidence on its face is not evidence of discrimination sufficient to establish that the liquidity requirements were pretextual.

Elbanna cites to two comparators - Caucasian individuals who were approved

for a franchise despite not meeting the same liquidity criteria.  Specifically, Captain D's made an exception to its liquidity requirement in September 2007 in approving new franchise applicant Joe Anderson, who listed on his financial application only $85,000 in liquid assets.  (Docs. 48-13 at 9; 39-3 at 6 (Brown Dep. at 129).)  Though the Anderson application listed liquid assets at $85,000, "we considered this note receivable of $255,000 as liquid," and readily convertible into cash, meeting Captain D's liquidity requirement.  (Doc. 36-9 at 16 (Payne Dep. at 61-64).)  The note was from Skyline of Indiana, which was owned by Anderson's two sons.  Further, Anderson "was deemed as an excellent operator, and was operationally very strong, and very ingrained . . . in this community in Indiana."  (Doc. 39-4 at 21 (Head Dep. at 81).)

The second comparator, Tom Davis, listed liquid assets at $100,000.  (Docs. 39-4 at 19 (Head Dep. at 74); 48-10 at 3.)   Company chief financial officer Payne stated that the company approved Davis because "Mr. Davis had been a senior executive with the company for a large number of years.  We felt that some consideration was appropriate for that."  (Doc. 36-9 at 15 (Payne Dep. at 58).)  Head said that Davis had been with the Shoney's-Captain D's system for over 30 years rising from assistant manager to a regional vice president, "and was [a] very skilled operator on a one, two, three, five restaurant basis, was looking to do one restaurant in Spring Hill, Tennessee."  (Doc. 39-4 at 19 (Head Dep. at 75).)  Mr. Davis planned

to be on-site as general manager. "He and his wife will run it every day. . . [I]t's their retirement. It's their income. It's everything to them. So with that much skin in the game, and . . . that much riding on the success of the restaurant, . . . that type of individual and that type of situation is historically a very good bet in the restaurant business." (Id. at 78.)

"When comparing similarly situated individuals to raise an inference of discriminatory motivation, the individuals must be similarly situated in all relevant respects besides race, . . . since '[d]ifferent treatment of *dissimilarly* situated persons does not violate' civil rights laws." Jackson, 372 F.3d at 1273-74 (citations omitted; emphasis in original). To that end, "[t]he comparator must be nearly identical to the plaintiff to prevent courts from second-guessing a reasonable decision by the [defendant]." Wilson, 376 F.3d at 1091; see also e.g. Rioux v. City of Atlanta, Ga., 520 F.3d 1269, 1280 (11th Cir. 2008).

Further, "[i]t is not at all improper for an employer or a business contemplating a long-term association to prefer doing business with someone with whom they are familiar." Brown, 939 F.3d at 951. A business's preference for selecting and contracting with someone with whom it is familiar and is thus a "known quantity" is a legitimate nondiscriminatory basis for its franchise decision. See Id., at 946; accord Price v. M & H Valve Co., 177 Fed. Appx. 1, 12 (11th Cir. 2006)(an employer or business "may use legitimate, non-discriminatory subjective factors in its decision-

23

making"); see also Springer v. Convergys Customer Mgmt. Group Inc., 509 F.3d 1344, 1350 (11th Cir. 2007)("'[a]bsent evidence that subjective hiring criteria were used as a mask for discrimination, that an employer based a hiring or promotion decision on purely subjective criteria will rarely, if ever, prove pretext'" (citation omitted)). "A subjective reason is a legally sufficient, legitimate, nondiscriminatory reason if the defendant articulates a clear and reasonably specific factual basis upon which it based its subjective opinion." Denney v. City of Albany, 247 F.3d 1172, 1186 (11th Cir. 2001). Furthermore, "'[t]he mere fact that an employer failed to follow its own internal *procedures* does not necessarily suggest that the employer was motivated by illegal discriminatory intent or that the substantive reasons given by the employer for its employment decision were pretextual.'" Springer, 509 F.3d at 1350 (citation omitted).

Again, it is not the Court's responsibility to second guess the wisdom of Captain D's reasoning but to determine if the reasons given were merely a cover for discriminatory intent. Even accepting Elbanna's conclusion that his application was superior to Anderson and Davis as to net worth and liquidity, the fact that Captain D's had prior relevant experience with the other applicants or considered a note receivable as "liquid" means that Elbanna's comparators are not "nearly identical" to him, and "makes a point by point comparison of the applicants' credentials less useful." Brown, 939 F.3d at 953. Elbanna has failed to show that Captain D's gave

preferential financial consideration to a non-Arab under "nearly identical" circumstances.

## 2. Operational Inspections

To Captain D's, the results of the Parker and Nelson inspections were a key component to its denying Elbanna the franchise transfer. "[W]e knew that Mr. Elbanna operated Shoney's restaurants. And we verified the operating level of those restaurants were not something we would want to have in ours." (Doc. 39-4 at 20 (Head Dep. at 79).)

Elbanna attempts to rebut Captain D's proffered reason for denial - that his existing restaurant operations were not up to Captain D's standards - by merely disputing whether Captain D's inspection observations were accurate and truthful, contending that "direct evidence contradicts [Parker's] account." (Doc. 50-2 at 21, 24.) First, Elbanna submits a report generated by his "customer and sales tracking computer software program" which lists that the Dunn Avenue Shoney's visited by Parker served 67 customers between 10:00 a.m. and 11:00 a.m. and 70 customers between 11:00 a.m. and 12:00 noon on July 27, 2007, contradicting Parker's observation that the restaurant was nearly empty. (Doc. 48-8 at 2-4.)

Additionally, Elbanna offers three affidavits prepared by current and former management personnel for Shoney's which lauded Elbanna's Shoney's restaurants and noted substantial renovations and improvements in them between 2006 and

2007.  (Docs. 48-5, 48-6, 48-7.)  Shoney's franchise business consultant Jon DeMott said he does not recall any concerns regarding the operation of Elbanna's restaurants during the summer and fall of 2007 and at the time "I looked upon Mr. Elbanna as among Shoney's best franchisees."  DeMott said he does not recall ever executing the 2006 unsigned letters cited by Captain D's as corroboration for its inspections. (Doc. 48-7.)

The issue is whether Captain D's perception of Elbanna's performance, accurate or not, was the real reason for denying him a franchise in 2007.  The question is not whether Captain D's made an erroneous decision; it is whether the decision was made with discriminatory motive.  See Mayberry v. Vought Aircraft Co., 55 F.3d 1086, 1091 (5th Cir. 1995).  "The existence of competing evidence about the objective correctness of a fact underlying a defendant's proffered explanation does not in itself make reasonable an inference that the defendant was not truly motivated by its proffered justification."  Little v. Republic Refining Co., 924 F.2d 93, 97 (5th Cir. 1991).  In the employment context,

> even an incorrect belief that an employee's performance is inadequate constitutes a legitimate, non-discriminatory reasons.  We do not try in court the validity of good faith beliefs as to an employee's competence.  Motive is the issue. . . .  [A] dispute in the evidence concerning . . . job performance does not provide a sufficient basis for a reasonable factfinder to infer that [the] proffered justification is unworthy of credence.

Id.; see also Jones v. Gerwens, 874 F.2d 1534, 1540 (11th Cir. 1989)(even if

26

employer wrongly believed that plaintiff claiming discrimination violated employer's policy, if employer acted on this belief, it is not guilty of racial discrimination); Smith v. Papp Clinic, P.A., 808 F.2d 1449, 1452-53 (11th Cir. 1987)("[I]f the employer fired an employee because it honestly believed that the employee had violated a company policy, even if it was mistaken in such belief, the discharge is not 'because of race' and the employer has not violated § 1981.").  The Court does not re-examine or second-guess Captain D's business decisions; rather the Court's inquiry is limited to whether Captain D's gave an honest explanation of its behavior.  See E.E.O.C. v. Total System Servs., Inc., 221 F.3d 1171, 1176 (11th Cir. 2000).  This is not the forum to litigate whether or not Elbanna was in fact a good restauranteur.  Where pretext is an issue, "the question the factfinder must answer is whether [defendant's] proffered reasons were 'a coverup for a . . . discriminatory decision.'" Rojas, 285 F.3d at 1343. The Court reviews Captain D's decision for discrimination, not soundness.

Nothing in the record indicates that Captain D's singled out Elbanna for increased review or inspections of his other restaurant operations.  See Rojas, 285 F.3d at 1343.  Further, different evaluations of his restaurants by different entities does not establish pretext.  The final decision was made by the company's franchise committee in consideration of the Parker and Nelson investigation reports.  There is no evidence of bad faith on the part of either Parker or Nelson and the committee's decision not to verify the reports' accuracy does not establish pretext.  Hawkins v.

27

Ceco Corp., 883 F.2d 977, 980 n.2 (11th Cir. 1989).[6]

Elbanna also contends that Captain D's inspected the other restaurant operations of only two franchise applicants - himself, and Dwight Collins, who is African American, and that both he and Collins were rejected as franchisees. (Docs. 36-7 at 24 (Nelson Dep. at 95); 48-15 at 2-3;[7] 50-2 at 4.) Nelson testified that Mr. Collins already owned a Captain D's franchise and sought to acquire another in Louisiana in 2007. Nelson said he inspected Collins' existing franchise, taking notes and pictures. He reported to the Captain D's committee about his inspection, and the committee denied Collins' franchise transfer application. (Doc. 36-7 at 21 (Nelson Dep. at 81-84).)

Elbanna's citation to Captain D's inspections of two minority transfer applicants in August 2007 says nothing about the company's inspection practices applicable to all franchise applicants after 2006 when new CEO David Head "raised the bar" and inspections became standard procedure. There is no evidence of the total number of applicants; a comparison of those applicants whose other operations were

_____

[6]     Plaintiff has not asserted he should prevail on his claim under what is known as a "cats paw" theory. See Wright v. Southland Corp., 187 F.3d 1287, 1304 n.20 (11th Cir. 1999); Stimpson v. City of Tuscaloosa, 186 F.3d 1328, 1331-32 (11th Cir. 1999).

[7]     Captain D's rejection letter to Mr. Collins, also dated August 24, 2007, was nearly identical to the letter written to Elbanna. Both letters were signed by Nelson. (Doc. 48-15 at 2-3.)

inspected with all applicants; and the results of those inspections. "Statistics . . . without an analytic foundation, are virtually meaningless." Brown, 939 F.3d at 952.[8] Elbanna's evidence does not establish that Captain D's adopted a policy to inspect an applicant's other restaurant operations for a discriminatory purpose. Furthermore, in connection with the Anderson application, Captain D's parent company director for franchise development Michael Vogel made unannounced visits to Anderson's existing Dairy Queen and Skyline Chili franchise operations in Indiana on October 2, 2007 and found them "acceptable" with respect to cleanliness, staffing, customer service, and food preparation and presentation. "Based, in part, on the results of my operational inspection, Mr. Anderson was approved as a Captain D's franchisee."

---

[8]    On December 29, 2008, one week before the scheduled hearing on summary judgment, which included the New Year's holiday extended weekend, Captain D's filed three additional affidavits by company officials and one by Anderson in an effort to buttress its case. (Doc. 59.)  Plaintiff filed a motion to strike the late-filed affidavits (Doc. 60) to which defendants responded.  (Doc. 61.) The late-filed affidavits are not "opposing affidavits" which in accordance with Fed. R. Civ. P 6(c)(2) may be filed one day before the hearing on summary judgment, as suggested by Captain D's.  Rather, Captain D's filed the affidavits in support of its motion, though responding to arguments made by Elbanna.  Rule 6, particularly when read in conjunction with Fed. R. Civ. P. 56, contemplates that  the party adverse to a motion for summary judgment shall have "a reasonable and meaningful opportunity to respond to the legal theories and facts as asserted by the party moving for summary judgment." Burns v. Gadsden State Community College, 908 F.2d 1512, 1517 (11th Cir. 1990).  The rules contemplate that "the nonmovant will have at least 10 days in which to respond to those theories and facts before the court takes the summary judgment under advisement." Id. The Court has not considered the contents of the affidavits in reaching its determination on defendant's motion for summary judgment, and the plaintiff's motion to strike the affidavits is due to be granted.

(Doc. 39-5 at 2.)[9]

Nor may isolated comments cited by Elbanna be construed as evincing racial animus or discrimination. Elbanna has provided no evidence that the cited statements - "sneak attack his Operation,"[10] "[d]on't you get it? We don't want you as a franchisee," "not approvable," and "Khalil is bad news" - raise any questions about the truthfulness of Captain D's proffered reasons for denying the franchise transfer, even when viewed in the light most favorable to plaintiff. See Crawford, 482 F.3d at 1309; see also Abdulnour v. Campbell Soup Supply Co., 502 F.3d 496, 504 (6th Cir. 2007)(termination of employee, an Iraqi citizen, was not motivated by national origin discrimination; comment made to employee by manager that "the people of Northwest Ohio" may have a problem with him could not be construed to be discriminatory in the context of personality and management conflicts); Tippie v. Spacelabs Medical, Inc., 180 Fed. Appx. 51, 54 (11th Cir. 2006)(decision-maker's comment that employee,

_____

[9] Elbanna attempts to distinguish Vogel's visit to Anderson's existing restaurants on the basis that Anderson was applying for a new franchise as opposed to a transfer franchise. (Doc. 50-2 at 18 n.14.) However, Elbanna argues that the financial "exceptions" made for Anderson and Davis, though new franchise applicants, are relevant because the financial requirements were the same. (Id. at 11 n.6.) Captain D's attempts to distinguish the Anderson and Davis financial considerations arguing they were "not similarly situated" because they were new franchises as opposed to transfer franchises, and that a different decision maker was involved. (Doc. 36 at 20.) New franchise and transfer franchise evaluations after 2006 are comparable and the fact that Captain D's inspected Anderson's existing franchise operations is relevant.

[10] Slang for making an unannounced visit to Elbanna's Shoney's restaurants.

who was denied promotion to position in which "native in Spanish language" was an important requirement, "speaks some basic Spanish but is not native" "was a manner of describing Tippie's Spanish language abilities, not her national origin").

As in Brown, Elbanna has produced scattered pieces of circumstantial evidence, none of which, even taken as a whole, raise sufficient questions to undermine Captain D's nondiscriminatory rationale. Brown, 939 F.3d at 954. Unlike Howard, however, Elbanna has not cited to any inconsistencies in Captain D's evidence with respect to the qualifications of those awarded franchises; policies of inspecting restaurants of applicants after 2006 and deviations from this policy; or unwritten ad hoc requirements. See Howard, 32 F.3d at 526. Particularly as to the restaurant inspections, Elbanna merely denies the credibility of Captain D's witnesses, Nelson and Parker, and contends an African American applicant's other restaurants were also inspected. See Id. ("identification of a defendant's inconsistent statements has evidentiary value; mere denial of credibility has none."). Nor has Elbanna demonstrated that a less qualified non-protected applicant was awarded these particular transfer franchises. See Brown, 939 F.2d at 950. "The inquiry into pretext centers upon the [defendant's] beliefs, and not the [plaintiff's] own perceptions of [his] performance." Holifield, 115 F.3d at 1565. A plaintiff's own speculation or subjective belief of discrimination, however genuine, cannot preclude summary judgment or be a basis for judicial relief. Thomas v. Nicholson, 263 Fed. Appx. 814,

31

816-17 (11th Cir. 2008)(citing Cordoba v. Dillard's Inc., 419 F.3d 1169, 1181 (11th Cir. 2005)). By failing to rebut each of the legitimate, nondiscriminatory reasons proffered by Captain D's, Elbanna has failed to raise a genuine issue of material fact about whether those reasons were pretext for discrimination. None of the circumstantial evidence cited by Elbanna even suggests that Captain D's took into account Elbanna's national origin or Arab race. "The ultimate inquiry remains whether the plaintiff has demonstrated that the defendant *intentionally* discriminated in refusing to enter into a contractual relationship." Brown, 939 F.2d at 953 (emphasis in original). Elbanna's evidence is insufficient to allow him to take his case to the jury on this issue.

### B. Defamation

To establish a *prima facie* case of defamation under Florida law,[11] the plaintiff must show that "(1) the defendant published a false statement; (2) about the plaintiff; (3) to a third party; and (4) the party suffered damages as a result of the publication." Bell v. Novartis Pharms. Corp., No. 8:08-cv-30-T-17-EAJ, 2008 WL 2694893 (M.D. Fla. July 3, 2008)(citing Thompson v. Orange Lake Country Club, Inc., 224 F. Supp.2d 1368, 1376 (M.D. Fla. 2002).

Captain D's argues that "Elbanna's defamation claim fails because he cannot

---

[11] The Court has supplemental jurisdiction over Elbanna's state common law defamation claim. 28 U.S.C. § 1367.

show that the allegedly defamatory statements were published by anyone other than himself.  Captain D's statement to the Blackman brothers are not defamatory because they had a business interest in the transaction."  (Doc. 36 at 12.)  Specifically, Captain D's argues that its August 24, 2007 letter and September 4, 2007 conversation in which Nelson stated the company's reasons for denying the franchise transfers to Elbanna, contained opinion and were privileged, and thus are not defamatory.  (Doc. 36 at 23 (citing Beck v. Lipkind, 681 So.2d 794 (Fla. 3d DCA 1996)).  Elbanna responds that a speaker cannot invoke a "pure opinion" defense if the underlying facts are false or inaccurately presented.  (Doc. 50-2 at 25 (citing Lipsig v. Ramlawi, 760 So.2d 170, 184 (Fla. 3d DCA 2000)).

Statements are not defamatory if they are "either true, pure opinion, or protected by a qualified business privilege."  Beck, 681 So.2d at 795.  "Pure opinion occurs when the defendant makes a comment or opinion based on facts . . . which are otherwise known or available to the reader or listener as a member of the public."  From v. Tallahassee Democrat, Inc., 400 So.2d 52, 57 (Fla. 1st DCA 1981).  "[T]he essential elements of the qualified privilege are: (1) good faith; (2) an interest in the subject by the speaker or a subject in which the speaker has a duty to speak; (3) a corresponding interest or duty in the listener or reader; (4) a proper occasion; and (5) publication in a proper manner."  Thomas v. Tampa Bay Downs, Inc., 761 So.2d 401, 404 (Fla. 2d DCA 2000).  "With respect to the qualified privilege founded on business

matters, the otherwise slanderous publication must be in regard to the business, made by one having an interest in the business and solely to others having an interest in the business." Axelrod v. Califano, 357 So.2d 1048, 1051 (Fla. 1st DCA 1978). Captain D's has the burden to prove the defense of qualified privilege. Once it is determined that a qualified privilege exists, however, there is a presumption of good faith which Elbanna must rebut with evidence of express malice. Thomas, 761 So.2d at 404. "The issue of whether this qualified privilege exists is not a jury question when the circumstances surrounding the communication are undisputed; the question should be decided by the court." Cape Publications, Inc. v. Reakes, 840 So.2d 277, 280 (Fla. 5th DCA 2003); see also Nodar v. Galbreath, 462 So.2d 803, 810 (Fla. 1984).

Express malice has been described as "ill will, hostility, evil intention to defame and injure." Cape Publications, Inc., 840 So.2d at 281 (citation omitted). Express malice exists "'where the primary motive for the statement is shown to be an intention to injure the plaintiff.'" Thomas, 761 So.2d at 404 (citation omitted). "Where a person speaks upon a privileged occasion, but the speaker is motivated more by a desire to harm the person defamed than by a purpose to protect the personal or social interest giving rise to the privilege, then it can be said that there was express malice and the privilege destroyed." Cape Publications, Inc., 840 So.2d at 281.

Here, all of the alleged statements complained of were made by Nelson of

Captain D's to Tim Blackman, a Captain D's franchisee.  The statements were made in the context of informing Blackman why the company did not approve the proposed sale of Blackman's franchises to Elbanna.  Blackman described Nelson's comments in the initial telephone conversation as a "very vague and general explanation," saying that Nelson stated he "did not like the look of" Elbanna's Shoney's restaurant's food bar, and that he walked back into the kitchen "and did not like what he saw."  (Doc. 48-3.)  Nelson allegedly repeated these same comments a week later in a face to face meeting with Blackman, providing a "vague explanation," and saying he "did not like what he saw."  Additionally, Elbanna contends Nelson told Blackman that Elbanna "did not have enough liquid assets to be approved as a Captain D's franchise."  (Doc. Id.)  The August 24, 2007 rejection letter copied to Blackman reiterated that Elbanna did not meet the company's financial qualifications and referred to "the observed quality of the operations of your existing restaurants."  (Doc. 52-2.)

Nelson's comments are not defamatory.  Described by Blackman as "vague" and "general," the strongest language used was that Nelson said he "did not like what he saw"[12] and "did not like the look of" the food bar.  Elbanna has proffered no evidence that these statements are false.  As to the statement about Elbanna's liquid assets, there is no dispute that Elbanna's 2007 application did not technically list

---

[12]      Even if Nelson mis-spoke about inspecting the kitchen, his statement about the kitchen - that "he did not like what he saw" - is so vague and undefined that it cannot be construed as a false statement.

sufficient liquid assets meeting Captain D's criteria.

Even considering, *arguendo* that the cited statements are defamatory, the statements were made in the business context and privately by a speaker to another who shared a legal interest in the proposed franchise transaction under discussion. <u>See</u> <u>Cape Publications, Inc.</u>, 840 So.2d at 280. Particularly given the "vague," "general," and circumspect nature of the statements complained of, Elbanna cites no evidence establishing that Nelson acted with express malice. Accordingly, the statements cited by Elbanna as defamatory are subject to a qualified privilege as a matter of law. <u>See</u> <u>White v. School Bd. of Hillsborough County</u>, No. 8:06-CV-1626-T-27MAP, 2008 WL 227990, at *6-7 (M.D. Fla. Jan. 25, 2008).

## Conclusion

This is a business disagreement between two sophisticated parties, Mr. Elbanna and Captain D's. While the Court expresses no view as to whether other causes of action may have arisen from this disagreement, the Court has searched high and low and finds absolutely no evidence that Mr. Elbanna's race had anything to do with it, nor was he defamed. Summary judgment is due to be granted.

For the foregoing reasons, and upon due consideration, it is hereby

**ORDERED**:

1.     Captain D's, LLC's Motion For Summary Judgment (Doc. 36) is **GRANTED**.

2.      Plaintiff's Objections To Magistrate Judge's Order Denying Plaintiff's Motion For Leave To File An Amended Complaint, (Doc. 40), is **MOOT**.

3. Plaintiff's Motion To Strike Defendant's Supplemental And Additional Declarations In Support Of The Motion For Summary Judgment (Doc. 60) is **GRANTED**.

4.      The Clerk shall enter Judgment in favor of defendant Captain D's, LLC, and against plaintiff Khalil Elbanna, and close the file.

**DONE AND ORDERED** at Jacksonville, Florida, this 17th day of February, 2009.

TIMOTHY J. CORRIGAN
United States District Judge

jl.
Copies to:

Honorable Monte C. Richardson
United States Magistrate Judge

Counsel of Record